IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ANTHONY HAUBE,<br><br>                Petitioner,<br><br>   vs.<br><br>WILLIAM LAPINSKAS, Superintendent,<br>Spring Creek Correctional Center,[1]<br><br>                Respondent. | No. 3:17-cv-00170-JKS<br><br>MEMORANDUM DECISION |

Anthony Haube, a state prisoner now represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Haube is in the custody of the Alaska Department of Corrections and incarcerated at Spring Creek Correctional Center. Respondent has answered, and Haube has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

Haube, along with co-defendants Thomas Lyons, and Thomas Evenson, was charged with first- and second-degree murder in connection with the April 2005 killing of Michael Gerber. Haube was also charged with second-degree robbery and two counts of tampering with

---

[1] William Lapinskas, Superintendent, Spring Creek Correctional Center, is substituted for Earl Houser, Superintendent, Goose Greek Correctional Center. FED. R. CIV. P. 25(c).

-1-

physical evidence. On direct appeal of his conviction, the Alaska Court of Appeals laid out the following facts underlying the charges against Haube:

> During the early morning of April 1, 2005, Anthony Haube, Thomas Lyons, Thomas Evenson, Tom Hixon, and Michael Gerber were gathered in a Petersburg apartment, drinking and playing cards.
> Gerber was dating Charlene Hixon (Tom Hixon's sister), who had previously dated Haube. Haube had fought with Gerber on prior occasions, and a few days before the murder, Haube told Charlene Hixon that he was "going to shank [her] boyfriend's ass."
> At some point during the April 1 gathering, a fight broke out. Tom Hixon testified that Lyons, Haube, and Evenson proceeded to severely beat Gerber, and that Haube threw Gerber out of a second-story window into an alley. Haube and Lyons then went downstairs and after about fifteen minutes, they returned to the apartment, covered in blood.
> The next day, Charlene Hixon found Gerber's body in the alley, hidden underneath sheets of aluminum siding. Gerber had been cut over seventy times. There were defensive wounds on his hands, indicating that he was alive and conscious at the time that the cuts were made. The cause of death was from two deep knife wounds to his chest and a cut throat.

*Haube v. State*, No. A-10047, 2010 WL 2871078, at *1 (Alaska Ct. App. Jul. 21, 2010).

Lyons entered a plea agreement with the State and agreed to testify in exchange for pleading guilty to a charge of criminally negligent homicide. He was sentenced to 10 years' imprisonment, with 3 years suspended. Evenson was tried twice and both times the jury was unable to reach a verdict. He ultimately entered a plea agreement with the State in which he pleaded no contest to second-degree assault and was sentenced to 8 years' imprisonment, with 3 years suspended.

Shortly after Evenson's second trial ended with a hung jury, Haube went to trial where he did not testify. The jury returned a verdict finding Haube guilty of second-degree murder. When the superior court judge polled the jury by asking, "Is this your true and correct verdict?", one of the jurors, Juror B., answered, "Unless he tells me what he was doing during that time." The trial judge cautioned the juror that Haube had no obligation to say anything and that the juror could not use Haube's silence against him. The juror then answered in the affirmative when again asked if the guilty verdict was true and correct.

-2-

Case 3:17-cv-00170-JKS   Document 31   Filed 11/21/19   Page 2 of 18

After polling the rest of the jurors, the trial judge further questioned Juror B. about her response at Haube's request. In response, Juror B. stated that she wished Haube was not guilty. Haube moved for a mistrial, arguing that the juror's response indicated that the jury had not been unanimous in its verdict. The trial judge told Haube's attorney to pursue the motion for a new trial in writing and discharged the jury.

About three days later, Juror B. contacted the trial judge by telephone. The judge suggested that she set out her concerns in a letter. Juror B.'s letter stated that she "should have held out for what [she] believe[d] in which was that Anthony Haube is not guilty of second-degree murder." Following briefing and argument, the trial judge ultimately denied Haube's motion for a new trial. He subsequently sentenced Haube to 85 years' imprisonment.

Through counsel, Haube appealed, arguing that: 1) the trial judge erred in denying his motion for a new trial; and 2) his 85-year sentence was excessive. The Court of Appeal unanimously affirmed the judgment against Haube in a reasoned, unpublished opinion issued on July 21, 2010. *Haube*, 2010 WL 2871078, at *7. The Alaska Supreme Court denied review without comment on December 17, 2010.

Haube then filed a counseled application for post-conviction relief, arguing that his trial attorney was ineffective in his use of an expert witness concerning alcohol-related memory issues. He additionally argued that trial counsel was ineffective for failing to seek suppression of five knives that the State introduced as trial. The superior court dismissed Haube's application for failure to state a prima facie claim for relief. Haube appealed the decision, and the Court of Appeal unanimously affirmed the dismissal in a reasoned, unpublished decision. *Haube v. State*, No. A-11504, 2015 WL 7709589, at *5 (Alaska Ct. App. Nov. 25, 2015). Haube petitioned for hearing in the Alaska Supreme Court, which was summarily denied on August 10, 2016.

Haube timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court dated August 8, 2017. Docket No. 1; *see* 28 U.S.C. § 2244(d)(1),(2). His accompanying request for appointed counsel was granted, Docket No. 4, and an Amended Petition (Docket No. 17;

"Petition") was filed. Briefing is now complete, and the case is before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his counseled Petition before this Court, Haube argues that: 1) the Alaska Court of Appeals unreasonably applied clearly-established federal law when it denied Haube's coerced verdict claim; 2) the Court of Appeals' rejection of his coerced verdict claim was based on an unreasonable determination of the facts in light of the evidence presented; and 3) the Alaska Court of Appeals unreasonably applied clearly-established federal law when it rejected Haube's claim that trial counsel was ineffective for failing to move for suppression of the five knives admitted as evidence at trial.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). The term unreasonable is a common term in the legal world. The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

-5-

Case 3:17-cv-00170-JKS   Document 31   Filed 11/21/19   Page 5 of 18

IV. DISCUSSION

1.   Exhaustion

Respondent urges the Court to dismiss all claims as unexhausted and procedurally defaulted. This Court may not consider claims that have not been fairly presented to the state courts. 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases). Exhaustion of state remedies requires the petition to fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Duncan v. Henry*, 513 U.S. 364, 365 (1995). A petitioner must alert the state courts to the fact that he is asserting a federal claim in order to fairly present the legal basis of the claim. *Id.* at 365-66. To satisfy the "fairly present" requirement, the petitioner must present his or her federal claim to "each appropriate court (including a state supreme court with powers of discretionary review)" so that the each court is alerted to the federal nature of the claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) (per curiam). In Alaska, this means that claims must first be presented to the Alaska Superior Court. If the petitioner disagrees with that result, the claim should be raised to the Alaska Court of Appeals, and if he disagrees with that result, the claim should be raised in a petition for hearing to the Alaska Supreme Court.

In the Ninth Circuit, a petitioner must make the federal basis of the claim explicit either by referencing specific provisions of the federal Constitution or statutes or by citing to federal case law. *Robinson v. Schiro*, 595 F.3d 1086, 1101 (9th Cir. 2010). Mere similarity of claims between a state law claim and a federal law claim is insufficient for exhaustion purposes. *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996). In order to present the substance of a claim to a state court, the petitioner must reference a specific federal constitutional provision as well as a statement of facts that entitle the petitioner to relief. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996). Once the petitioner fairly presents the claim to the state courts, exhaustion is satisfied even if the state court's decision is silent on the particular claim. *See Dye v. Hofbauer*, 546 U.S.

-6-

1, 3, (2005) (per curiam).

Respondent contends that Haube never presented his claims relating to Juror B. (Grounds 1, 2) as violations of due process or the right to a fair trial. Rather, Haube "characterized his challenge to the questioning of Juror [B.] as a claim under Alaska Criminal Rule 31 and the Alaska constitution." Docket No. 22 at 15. Respondent likewise avers that, although Haube raised his contention that his trial attorney should have moved for suppression of the knives, he presented to the Alaska Supreme Court only the claim that counsel was ineffective in not requesting a *Thorne* instruction[2] as to a knife that was accidentally spray-painted.

The Court agrees with Haube, however, that a review of the petition for review in its entirety demonstrates that the presentation of the juror coercion claim was sufficient to raise the federal issues of due process and the right to a fair trial. Likewise, a comprehensive reading of the petition for review supports that Haube additionally raised to the Alaska Supreme Court his claim that trial counsel should have moved for suppression of the knives. Accordingly, the Court will address the merits of the claims as discussed below.

2. Merits

    i.    *Coerced Verdict* (Grounds 1, 2)

Haube first argues that the Alaska Court of Appeals unreasonably applied clearly-established U.S. Supreme Court authority when it denied Haube's claim that the trial court's post-verdict questioning of Juror B. was unduly coercive and that the appellate court's denial was based on an unreasonable determination of the facts in light of the evidence presented.[3] The Alaska Court of Appeals considered and rejected Haube's claim concerning Juror B. as follows:

---

[2] *See Thorne v. Dep't of Pub. Safety*, 774 P.2d 1326 (Alaska 1989) (requiring an adverse-inference instruction telling the jury to presume that evidence missing from the State's case would have been favorable to defendant).

[3] To the extent that Haube challenges the Court of Appeals' determination that Juror B. joined in the verdict, current Supreme Court authority holds that, at least in non-capital cases, there is no federal constitutional right to a unanimous verdict in a state criminal trial. *Schad v. Arizona*, 501 U.S. 624, 634 n.5 (1991); *Apodaca v. Oregon*, 406 U.S. 404, 406 (1972).

-7-

*The jury poll and Judge Zervos's exchanges with Juror B.*

After the jury returned to court with a verdict finding Haube guilty of murder in the second degree, Haube asked Judge Zervos to poll the jury. Judge Zervos began to poll the jury. When Judge Zervos got to Juror B., the following exchange ensued:

> THE COURT: Ms. B., the verdict of guilty of murder in the second degree. Is this your true and correct verdict?
>
> JUROR: Unless he tells me what he was doing during that time.
>
> MR. HEDLAND [counsel for Haube]: What?
>
> THE COURT: Okay. You understand he has no obligation to do or say anything. And you can't use that, in any way, in making the decision.
>
> JUROR: I know. So then I have to say yes.
>
> THE COURT: It's your true and correct verdict, as to murder in the second degree?
>
> JUROR: Uh-huh (affirmative).
>
> THE COURT: I'm sorry. Yes, you're saying?
>
> JUROR: Yes.

Judge Zervos continued polling the rest of the jury. Then, at Haube's request, he questioned Juror B. further regarding her response.

> THE COURT: . . . Ms. B., obviously the . . . rules about returning a verdict on these cases involves certain . . . requirements. And the one requirement that's important for us to understand, and for you to tell us about is what's going on in your mind and heart about this issue, concerning whether or not Mr. Haube says anything or doesn't say anything.
>   The way . . . our law is, under our Constitution is that that's not an issue that can be considered, in any way in reaching a verdict, whether he testified or not. It's just not a relevant issue. And you seem to imply that that was causing you some difficulty.
>
> JUROR: I haven't slept. I don't even know what you just said.
>
> THE COURT: You don't know what I just said? I'm sorry.
>
> JUROR: No.
>
> THE COURT: Okay . . . . the issue about whether Mr. Haube testifies or not is not an issue that the jurors can consider in reaching their decision . . . . He has that Constitutional right to make that decision. Whatever he chooses, that's his right to do.
>
> JUROR: Okay.

-8-

THE COURT: Obviously, sometimes, people do testify. Sometimes, people don't. But it's not an issue that the jury . . . can consider in reaching a decision. And when you answered the question earlier, you said something about him making or not making a statement, and . . . what we need to make clear here-and I need to understand from what's going on in your heart and your mind, that that's not an issue, or it can't be an issue in your reaching your decision about whether Mr. Haube is guilty or not guilty of these offenses.

JUROR: I don't know.

THE COURT: Pardon me?

JUROR: I don't know.

THE COURT: Okay.

JUROR: I can't-I am so tired of this.

THE COURT: Right. Well, I guess the question that I need to put directly to you is then that issue about whether he testified or not, did that lead you to make your decision about what the outcome of this case is?

JUROR: No. I just wish he would tell me what he was doing.

THE COURT: But . . . he has no obligation to do that.

JUROR: No.

THE COURT: And that's not a factor that the jury can consider in making their decision. That's important. Any question about that?

JUROR: No. But I'd still like to know.

THE COURT: Oh, yeah. I know. Sure, just as a matter of completeness or some other matter. But as to whether or not Mr. Haube was or was not guilty of this offense, does that, the fact that he . . . did not testify . . . was that used by you in reaching your decision, that he was guilty of . . .

JUROR: No. I just . . . wish that he wasn't.

THE COURT: Wish that he wasn't guilty?

JUROR: Yeah.

THE COURT: All right. So, if I understand and-if I can recap and please correct me if I'm wrong on this. You've made your decision that Mr. Haube is guilty of the murder in the second degree, you wish he would say something about it, so that you can come to a different decision, but that's not what you're basing you decision that he's guilty of this offense on?

JUROR: No. I'm basing it on I think he may have kicked the guy. According to your rules . . .

-9-

Case 3:17-cv-00170-JKS   Document 31   Filed 11/21/19   Page 9 of 18

> MR. HEDLAND: Your Honor, I'm moving for a mistrial right now.

Judge Zervos decided to dismiss the jury, and he told Haube's attorney to pursue a motion for a new trial in writing.

About three days after Judge Zervos had discharged the jury, Juror B. contacted Judge Zervos by telephone. He suggested that she set out her concerns in a letter. Juror B. then wrote a letter in which she stated that she "should have held out for what [she] believed in which was that Anthony Haube is not guilty of second-degree murder."

*Judge Zervos's decision denying Haube's motion for mistrial*

Following briefing and argument, Judge Zervos entered a decision denying Haube's motion for a new trial. He first turned to Juror B.'s statements in court, when the verdict was returned. The judge concluded: "Ms. B.'s initial response does not seem equivocal at all. She said that her verdict was guilty but she added 'unless he tells me what he was doing during that time.' But right after this statement, she specifically said that her verdict was guilty."

The judge next focused on whether Juror B. had improperly considered Haube's failure to testify in reaching a verdict. He concluded that her statements showed that she had not:

> Twice Ms. B. said she did not consider Mr. Haube's silence in reaching her verdict. But twice she also said that she wished things were different. Ms. B.'s wishes probably reflect the emotional difficulty she was having with her verdict. Her verdict was guilty but she wanted it to be different.
>
> Based on Ms. B.'s statements, the court is convinced that she did not use Mr. Haube's silence in reaching her verdict. The court is also convinced that Ms. B.'s verdict, like the verdict of the other jurors, was that Mr. Haube is guilty.

Judge Zervos further reasoned that the policy underlying Alaska Evidence Rule 606 cautioned against relying on Juror B.'s "unsolicited, incomplete statement about her reason for the verdict . . ." during his second inquiry in court. Finally, Judge Zervos concluded that Evidence Rule 606(b) prohibited him from considering the statements in Juror B.'s letter. For these reasons, the judge denied Haube's motion for a new trial.

*Why we uphold Judge Zervos's decision*

Alaska Criminal Rule 31(a) requires that the jury's verdict in a criminal case be unanimous. Rule 31(d) also provides that "[w]hen the verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If, upon the poll, there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged ."

Accordingly, when the jury in Haube's case returned its verdict and Haube asked to have the jury polled, Judge Zervos's duty was to determine whether the jury's verdict was unanimous. That is exactly what Judge Zervos did.

The problem with Juror B.'s initial response to the poll, as Judge Zervos recognized, was that she stated, "Unless he tells me what he was doing during that time." Judge Zervos immediately responded that Haube had no duty to say anything and that the jury could not use Haube's silence against him. Juror B. agreed and affirmed her guilty verdict. We conclude that Judge Zervos acted within his discretion in confirming that Juror B. had agreed to the verdict. We agree with Judge Zervos that, during this first inquiry, Juror B. unequivocally confirmed that her verdict was that Haube was guilty of murder in the second degree.

Judge Zervos addressed Juror B. a second time. Judge Zervos concluded from

-10-

Juror B.'s responses that she had not considered Haube's failure to testify in reaching her verdict and that she had again affirmed the fact that she had agreed to the guilty verdict. We conclude that Judge Zervos's findings about this inquiry are supported by the record.

Haube argues that Judge Zervos should not have questioned Juror B. in open court. He argues that this questioning created "a coercive or confusing situation" and that questioning her "in front of other jurors prevented [Juror B.] from raising an issue related to those jurors."

But Haube never objected to Judge Zervos's questioning of Juror B. In fact, Haube specifically asked Judge Zervos to question the juror. And Haube never objected to Judge Zervos's questioning or asked him to question the juror outside the presence of the other jurors. Therefore, Haube has not preserved this issue for appeal.[FN3] Furthermore, we fail to see how questioning the juror in private would necessarily have been less coercive than questioning her in open court.

> FN3. *Barrett v. State*, 772 P.2d 559, 568 n.10 (Alaska App. 1989) (discussing "plain error" and "invited error").

In addition, Judge Zervos concluded that Evidence Rule 606(b) prohibited him from considering Juror B.'s "unsolicited, incomplete statement about her reason for the verdict." Rule 606(b) prohibits inquiring into the validity of the jury's verdict or the jury's deliberations. The only exception is when there is a question about whether "extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."[FN4]

> FN4. Evidence Rule 606(b) provides:
> Upon an inquiry into the validity of a verdict or indictment, a juror may not be questioned as to any matter or statement occurring during the course of the jury's deliberations or to the effect of any matter or statement upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Rule 606(b) "should be interpreted so as to preserve and advance the policies underlying the rule: insulating the jury's deliberative process and promoting the finality of jury verdicts, while not foreclosing post-verdict attacks if external forces have erroneously been injected into the deliberative process."[FN5]

> FN5. *Larson v. State*, 79 P.3d 650, 659 (Alaska App. 2003) (citing the Commentary to Alaska Evid. R. 606(b), seventh paragraph).

As Judge Zervos recognized, "there seems to be no logical reason why the principles underlying Rule 606(b) should not apply to comments made by a juror about the jury's deliberations during a jury poll." There is support for this conclusion. The language of the rule does not limit itself to inquiries that are made after the jury is discharged. And the American Bar Association Standards on Trial by Jury state:

-11-

> The poll should be conducted so as to obtain an unequivocal expression [of assent or dissent] from each juror. If this is obtained, then any volunteered statements by a juror in explanation of the juror's verdict may be disregarded. A juror should not be asked to give reasons for the verdict . . . .[FN6]
>
> > FN6. *ABA Standards for Criminal Justice: Discovery and Trial by Jury* § 15-5.6 and Commentary at 266 (3d ed., 1996).
>
> For purposes of this case, we do not need to decide whether Evidence Rule 606(b) applies to the statements which Juror B. made about how she arrived at her verdict. But certainly the policy behind the rule supports Judge Zervos's caution about relying on any statements that the juror made about her reasons for arriving at her verdict.
>
> Judge Zervos also concluded that Rule 606(b) precluded consideration of Juror B.'s letter. Juror B.'s letter did not allege that "extraneous prejudicial information was improperly brought to the jury's attention or [that] any outside influence was improperly brought to bear on any juror."[FN7] Her letter indicated that she had second thoughts about her verdict. Therefore, the letter clearly fell within the kind of allegation that the court could not consider under the evidence rule. We agree with Judge Zervos that Evidence Rule 606(b) prohibited him from considering Juror B.'s letter.
>
> > FN7. Alaska Evid. R. 606(b).
>
> We therefore conclude that Judge Zervos did not err in concluding that the jury verdict was unanimous, and that he therefore did not err in denying Haube's motion for a new trial.

*Haube*, 2010 WL 2871078, at *2-6.

Haube first avers that the state court unreasonably applied *Lowenfield v. Phelps*, 484 U.S. 231 (1988), and *Allen v. United States*, 164 U.S. 492 (1896), when it denied Haube's coerced verdict claim on direct appeal. These cases involve a trial court's use of a supplemental jury charge to encourage a jury to reach a verdict after the jury has been unable to agree for some period of deliberation, which is often referred to as an *Allen* charge, after the U.S. Supreme Court's sanctioning of a such charge in that case. In the case at hand, however, the jury was neither deadlocked nor told that it must reach a verdict. Respondent argues that, because of these differences, *Allen* and *Lowenfield* do not constitute "clearly established Federal law" prohibiting the type of questioning conducted here.

Although "the Supreme Court need not have addressed a factually identical case," *Houston v. Roe*, 177 F.3d 901, 906 (9th Cir. 1999), the Supreme Court has held that a state-court decision is contrary to federal law "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different

-12-

result. *Williams*, 529 U.S. at 406. Because there of the differences between the cases involving supplemental jury instructions to deliberate and the case at hand, Respondent is correct that it cannot be said that Haube's case is materially indistinguishable from *Allen* or *Lowenfield.*

Nonetheless, the Supreme Court has also held that a state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority. *Id.* As Respondent correctly notes, there is no clearly established Supreme Court law which squarely holds that questioning a jury about its verdict violates a defendant's due process rights *per se*. *See Drayton v. Castro*, 319 F. App'x 632, 634-35 (9th Cir. 2009). The Ninth Circuit has stated that a trial judge may ask a jury to clarify its verdict when the verdict is ambiguous or inconsistent. *Skains v. California*, 386 Fed. App'x 620, 622-23 (9th Cir. 2010).

A trial judge may not, however, coerce a verdict from a jury. "Clearly established federal law provides that '[a]ny criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body.'" *Parker v. Small*, 665 F.3d 1143, 1147 (9th Cir. 2011) (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988)). Haube avers that the state court's decision is contrary to this general rule. As aforementioned, however, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664 (2004).

In considering whether trial court's inquiry amounts to coercion, a reviewing court must consider the trial court's actions "in its context and under all the circumstances." *Lowenfield*, 484 U.S. at 237 (citation and internal quotation marks omitted). The court may consider the form of the conduct and any other indicia of coerciveness. *See United States v. Berger*, 473 F.3d 1080, 1090 (9th Cir. 2007). The ultimate question is "whether the trial judge's inquiry would be likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision." *Locks v. Sumner*, 703 F.2d 403, 406 (9th Cir. 1983).

In Haube's case, the trial record supports a conclusion that the trial judge did not coerce Juror B. to change her verdict. When the jurors were polled, Juror B.'s response indicated that

-13-

she may have relied on an impermissible basis for her finding of guilt.  The judge did not tell or even encourage Juror B. to change her verdict; rather, he sought to confirm that Juror B. agreed to the verdict in light of the fact that she could not rely on the Haube's decision not to testify.[4]  Considering the judge's comments in their "context and under the circumstances," the state court's conclusion that the judge's comments and questioning were not coercive was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).  Haube takes issue with the trial judge's statement that "twice [Juror B.] said she did not consider Mr. Haube's silence in reaching her verdict.  [Juror B.'s] wishes probably reflect the emotional difficulty she was having with her verdict.  Her verdict was guilty but she wanted it to be different."  Docket No. 30 at 6.  Haube argues that the statement is "highly misleading" and the findings are unreasonable "because they leave out the context in which these answers were given."  *Id.*  The Court has independently reviewed the transcript of the verdict.  Although Haube challenges the trial court's characterization of the exchange, the record supports the state courts' ultimate findings and legal conclusions that the trial court did not impermissibly coerce Juror B.'s guilty verdict.  There is simply no indication that the Court of Appeal relied on factual inaccuracies in its determination.  Accordingly, Haube is thus not entitled to relief on this claim.

---

[4] As Respondent acknowledges, the trial judge's questioning presented an "arguable problem" with respect to the no-impeachment rule, which gives "substantial protection to verdict finality," *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 861 (2017). *See* Docket No. 29 at 20-21.  The no-impeachment rule is embodied in Federal Rule of Evidence 606, which provides in pertinent part: "During an inquiry into the validity of a verdict or indictment, a juror may not testify about . . . the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." FED. R. EVID. 606(b)(1).

Here, Haube does not challenge the judge's questioning on 606(b) grounds, and indeed, because he specifically requested the questioning at trial, would be unable to do so.  Moreover, Rule 606(b), like its Alaska counterpart, similarly prevents this Court from relying on Juror B.'s post-verdict letter in assessing whether her verdict was coerced. *See Haube*, 2010 WL 2871078, at *5 (agreeing with trial judge that Alaska Rule of Evidence 606(b) prevented consideration of the letter).

-14-

ii. *Ineffective Assistance of Counsel* (Ground 3)

Haube additionally claims that his trial attorney rendered ineffective assistance by failing to seek the suppression of various knives that the State introduced at trial. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that appellate counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard. *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Haube must show that his trial or appellate counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied

-15-

Case 3:17-cv-00170-JKS Document 31 Filed 11/21/19 Page 15 of 18

if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Haube raised this ineffective assistance claim in a counseled application for post-conviction relief ("PCR"). Haube's trial attorney also submitted an affidavit in those proceedings in which he stated:

> I did not file a motion in limine to prohibit the introduction of various knives. The decision to let the knives into evidence was tactical. [PCR counsel] asserts that their introduction was prejudicial. I respectfully disagree. The fact that the state promoted certain knives as possible murder weapons when they clearly were not murder weapons was, in my estimation, damaging to the state's case and supported our position that the state's approach was to make assertions that were not only uncorroborated but also objectively wrong. Tactically—and this is without doubt subjective—I would much rather have the state introduce into evidence, as opposed to not introduce, a trinket "Pocket Ulu" knife that the state's medical examiner has previously endorsed as a possible murder weapon when I know that I can establish that it did not exist at the time of murder. Further, when I also know that I can get the medical examiner to admit not only that the trinket knife could not be the murder weapon but that, in addition, he had given prior, sworn, incorrect testimony that it could be the murder weapon as well, I want the jury to hear about it. Ironically, I would have loved to have the state assert that the "Pocket Ulu" knife was the murder weapon. It belonged to Evenson, and Savannah Loseth testified that Evenson said that he slit Gerber's throat with it.
> To my memory, the state introduced or referenced the "Pocket Ulu" knife, two[] nearly identical folding knives associated with Mr. Haube, the broken, serrated steak knife found near Mr. Gerber, a big kitchen knife, and a filet knife. The state's crime lab completely disassembled and analyzed the ones associated with Mr. Haube. They had several screws and small cavities. There was no blood on or in them. This was good for Mr. Haube. The serrated knife found in Mr. Gerber's vicinity (with the police paint on it) might have been the murder weapon, but that was not even clear. It was not particularly associated with any defendant and certainly not Mr. Haube. Ms. Hixon's description of the knife Mr. Haube allegedly "flicked" did not match the knives introduced into evidence, and she testified that the knives introduced were not the knife that she saw. It was as if the state introduced items not based upon their relevance but rather based upon the fact that the items were collected. The fact that the state so freely introduced all of the knives never made sense to me because their obvious irrelevance regarding guilt helped our defense. Or so it seemed at the time.
> Additionally, some of the knives were relevant from our perspective to other issues such as the adequacy of the police's investigation or bias of police and its witnesses. The "Pocket Ulu" knife was relevant, for example, to corroborate Savannah Loseth's testimony, and also relevant to show bias—that the state was content to endorse it as the murder weapon when Evenson was the defendant (with whom it was associated) even when it had actual knowledge that it could not be the weapon used to kill Mr. Gerber, but it was just as content to abandon that position when Mr. Haube was on trial.

Docket No. 22-21 at 3-4.

In considering this ineffective assistance claim on post-conviction review, the trial court appropriately cited Alaska analogues of *Strickland*, which appropriately articulate the federal standard for constitutionally effective counsel. *See, e.g.*, *Risher v. State*, 523 P.3d 421 (Alaska 1974) (mandating a two-prong test similar to *Strickland* where the applicant must: 1) prove that counsel's performance fell below the objective standard of a "lawyer with ordinary training and skill in the criminal law" and 2) make a "showing that the lack of competency contributed to the conviction"). Haube does not contend that the state courts relied on an inappropriate legal standard. Thus, to obtain federal habeas relief, Haube must show that the Alaska courts applied the federal ineffective standard unreasonably. *See* 28 U.S.C. § 2254(d)(1).

Haube fails to satisfy his heavy burden. The record supports the state court's conclusion that trial counsel made an informed tactical decision not to challenge the admission of the various knives for the reasons thoroughly articulated in trial counsel's affidavit. At best, Haube has now presented the opinions of two other attorneys (PCR counsel and federal habeas counsel) who have disagreed with trial counsel's strategy. But disagreements regarding trial tactics or strategies cannot form the basis of ineffective assistance claims, *Strickland*, 466 U.S. at 690, and tactical decisions are not ineffective merely because, in hindsight, better tactics are known to have been available, *Bashor v. Riley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Indeed, "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.

In the instant Petition, Haube claims that counsel's affidavit "does not explain why defense counsel did not at the very least seek a spoliation instruction." Docket No. 30 at 10. But Haube did not raise that specific claim to the state courts. Rather, with respect to the admission of the knives, Haube faulted counsel only for failing to seek a *Thorne* instruction on the knife that was painted by police. *See* Docket No. 22-27 at 13. Accordingly, any contention relating to the lack of a spoliation instruction is unexhausted and not properly before this Court. In any event, Haube fails to show that he was prejudiced by the omission such that a spoliation

-17-

instruction would have led to a better outcome. Haube is therefore not entitled to relief on his ineffective assistance claim either.

## V. CONCLUSION AND ORDER

Haube is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to grant a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: November 21, 2019.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge